COURT
OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

                                                 NO.
2-07-389-CR

 

 

LESTER WINNINGHAM, JR.                                                              APPELLANT

 

                                                             V.

 

THE STATE OF TEXAS                                                                             STATE

 

 

                                                       ------------

 

              FROM
THE 371ST DISTRICT COURT OF TARRANT COUNTY

 

                                                       ------------

 

          OPINION ON PETITIONS
FOR DISCRETIONARY REVIEW

 

                                                       ------------

Pursuant
to rule of appellate procedure 50, we have reconsidered our previous opinion
upon reviewing Appellant Lester Winningham, Jr.=s
and the State=s
petitions for discretionary review.  See
Tex. R. App. P. 50.  We withdraw our July
1, 2010 opinion and judgment, and we substitute the following primarily to
comport with the court of criminal appeals=s
recent opinion in Brooks v. State, which was handed down after our
original opinion issued.  See No.
PD-0210-09, 2010 WL 3894613, at *8, *14 (Tex. Crim. App. Oct. 6, 2010).

I.  Introduction

A
jury found Winningham guilty of murder and sentenced him to life
imprisonment.  The trial court entered
judgment accordingly.  In two points,
Winningham contends that the evidence is legally and factually insufficient to
support his conviction.  Because we hold
that the evidence is sufficient to support Winningham=s
conviction, we will affirm the trial court=s
judgment.

II.  Background

At
roughly 6:30 a.m. on Friday, July 22, 2005, when mechanic Craig Bayer arrived
for work in Muenster, Texas, he saw a Aheavy
column of smoke@ drifting into the air in
the field behind the shop where he worked. 
Bayer said that he initially did not Athink
much of it,@
believing that the smoke emanated from a truck that someone had started.  But as Bayer got closer to his shop, the
smoke became more visible. Bayer noticed fire and began to believe that someone
was burning trash at the business next door. 
Bayer described the flames as Asix
to eight feet tall [with] black smoke coming off of it.@  He looked for a water hose with the intent of
putting the fire out but did not find one. 
When Bayer came within ten to fifteen feet of the fire, which had died
down by then to a few feet high, he became certain it was not trash that was
burning.  At first, Bayer did not believe
what he was seeing.  He thought that he
was seeing a Amannequin,@ but
then he noticed that the Atoenails were painted and
[pantyhose were] around the feet@ of
the body in the fire.  Bayer called 9‑1‑1
and chose not to attempt to extinguish the fire.  Roughly five minutes later, the Muenster fire
chief arrived.  At that time, by Bayer=s
account, the fire was out.

County
officials called Texas Ranger Tracy Murphree to investigate.  At trial, Murphree described the scene:

It
was obviously a burned body of a white female, pretty much burnt beyond recognition.  It appeared that the body, previously to
being burned, was wrapped in some sort of blue tarp.  Really unable to determine an age or anything
because of the extensive burns.  Also
there, I saw a receipt from [an] Academy store in Arlington and a plastic bag
that appeared to have [once] held a rope. 
Also noticed that on the receipt, there was a listing for a rope that
was purchased on the receipt.

 

As
Murphree said, he found a July 2, 2005 receipt from an Academy Sports store in
Arlington, Texas, listing two items:  a A10 X
16 POLY TARP@ and
a A1/4"
X 50FT POLYG@
rope.  Murphree also found a partial footprint
and a tire track.  Plaster casts were
made.  Murphree testified that because of
the nature of the gravel road and the highly trafficked area where the
footprint and tire track were found, there Awouldn=t be
much to compare [the molds to].@  Murphree said that the female body had Aa
pretty obvious gunshot wound to about the midline section of the back.@  At that time, Murphree said, the body was
still unidentified.  The following
Tuesday, July 26, 2005, Murphree received a call informing him that, through
dental records, the body had been identified as the body of Deborah Houchin.

Assisted
by the Arlington Police Department, Murphree went to Houchin=s
home to further investigate, where he encountered another gruesome scene.  The house was disheveled.  Murphree saw blood-smeared eyeglasses in the
kitchen, blood drops near the home=s
computer, and a bloodied bullet that had been Aspent.@
Murphree also observed blood smeared Athrough
the kitchen, through the extra living area, through the laundry room, and into
the garage.@  Murphree said, AOne
of the things that also caught my eye was a ‑‑ a drawer was open
with a bag of dog food just ripped open in the drawer and a big bowl about half
full now that had water in it laying in the kitchen floor.@  Murphree said that another thing that Afirst@
caught his eye was a path of bleach stains along each step on the stairs. At
the end of the path, Murphree found an Aeyeglass
chain that was laying at the foot of the stairs.@

Murphree
said that because he concluded there were no signs of forced entry, no
valuables missing from the house, signs that the assailant attempted to clean
up something with bleach, and what appeared to Murphree as someone who cared
about the dogs having fed them before fleeing, he believed this was not a Astranger-on-stranger@
murder.  Murphree also said that the
manner in which Houchin=s body was found further
solidified his belief that Houchin had been murdered by someone she knew.

Murphree
learned that Houchin was a fifty-six-year-old therapist who had lived in
Arlington, Texas, and was associated with a group of other therapists who ran a
therapy clinic in Arlington.  The
Wednesday and Thursday after Houchin=s
body was found, Murphree went to the clinic to interview Houchin=s
coworkers.  He determined that the last
time her coworkers had seen Houchin alive was at approximately 11:00 p.m. on
Thursday, July 21, 2005.  Houchin=s
coworkers and other investigators informed Murphree that Houchin was not
expected to be at work on Friday, the day her body was found.  But her absence the following Monday had
caused her coworkers to file a missing persons report.  Murphree also learned that Houchin and
Winningham, in addition to being coworkers, had previously been romantically
involved.

Through
talking to coworkers, Murphree learned that Houchin and Winningham were once
engaged but later broke off their engagementCostensibly
because Houchin had asked Winningham for a prenuptial agreement.  Murphree also learned that the couple had
what was described as a Ayo-yo@
relationship where at times they were together and at other times they were
not.  Based on this information, Murphree
said that Winningham was naturally a person he would want to interview
regarding Houchin=s murder.

Murphree
testified that when he and another investigator visited the clinic during their
investigation, the other investigator pointed out peculiar markings on
Winningham=s
vehicle:

My
attention was drawn to vertical scratches just to the right side of the license
plate.  I could see inside those
scratches a ‑‑ a light blue ‑‑ some sort of transfer
that was very significant to me [because] the color of the transfer in those
scratches was the same color as the tarp that [Houchin] had been wrapped in
when her body was burned.

 

Murphree said that the color
was inconsistent with the vehicle=s
interior and exterior. Murphree had Winningham=s
vehicle impounded.

Murphree
said that the interior of the trunk Awas
pretty [pristine].@  By contrast, Murphree said that the interior
of the passenger compartment was A[p]retty
much in disarray, like somebody had been living in it.@

According
to Murphree, when investigators conducted a search of Winningham=s
car, there was Aa wad of cash of $13,000,@ a
folded piece of paper with thirteen $100 bills, and another folded piece of
paper with three $100 bills. Investigators also discovered a small amount of
Houchin=s
blood and dog hair in the trunk.

Murphree
also looked at Winningham=s banking and credit card
transactions during his investigation. 
Murphree testified that on July 28, 2005, Winningham withdrew $20,000
cash from his checking account. 
Winningham also wrote a check to the district court of Tarrant County in
the amount investigators recognized as the cost of applying for a passport.  Based on this information, Murphree
interviewed the administrative passport clerk in Arlington regarding Winningham=s
application for an expedited passport on July 22, 2005Cthe
same day Houchin=s body was discovered.  Murphree said that Winningham=s
credit card statements also confirmed Aa
charge for $1,089.32 to British Airways.@

Murphree
said that his team also conducted a search of Winningham=s
apartment.  There investigators
discovered a couple of Agood size[d] bags@
behind a bureau in Winningham=s
apartment with an Academy logo on them. 
Murphree testified that a tarp would have fit into one of the bags.

Murphree
testified that based on the information he gathered during his investigation,
his theory of the crime was:

I
know they=ve been romantically
involved.  I know from witnesses that
even though they=d had fights in the
past, this one was particularly vicious and to the point that [Houchin] was
inconsolable, in tears.  I think that she
was beginning to get her life together. 
She was beginning to try to start seeing other people.  I think that she threw that in [Winningham=s] face and let him
know that she was going on with her life, and I think that he shot her.

 

.
. . 

 

Then
I think he drags her body through the house, puts her body in the trunk of his
car, and either cleans up then or takes her there, sets her body on fire.  And then the next day or two, comes back and
cleans up.

 

.
. . 

 

I
think [the significance of the tarp and Academy receipt was that he purchased a
tarp and then] he wrapped her in the tarp to seal her body and to keep blood
and bodily fluids from leaking out.  And
when he drug her out of the trunk with the tarp, he set her on fire with the
tarp wrapped around [her and the blue marks on Winningham=s car were the result
of] either dragging her in or dragging her out [of the car] or both.

 

.
. .

 

[And
w]hen he finds out I=m coming to talk to
him, he immediately cancels all his appointments, withdraws $20,000, and leaves
the state. It=s my theory he was
going to run at that point and, for some reason, decided not to.

 

 








Murphree
conceded that in addition to withdrawing the $20,000, Winningham also wrote
checks to cover his health club membership and electric bill after Houchin was
murdered.  Murphree also conceded that
the check written for the passport was not written on the day Houchin=s
body was found; rather, the check was written on the following Monday.  But Murphree qualified that he had learned
through his investigation that Winningham was told he could not get an
expedited passport without an itinerary. 
Murphree also testified that Winningham had left a substantial remaining
balance in his checking account.

Murphree
disclosed that no attempts were made to compare DNA found at Houchin=s
home to Winningham and that he was unaware if any attempts were made to take
fingerprint lifts from the crime scene. 
Murphree revealed that he learned during his investigation that Houchin Ahad
plans for the night that she was killed [but] she changed those plans[.]@  In addition to Murphree, a number of Houchin=s
family members and coworkers testified. 
Several investigators and Winningham himself also testified.

A.      Marlene Wallem

Marlene
Wallem, Houchin=s sister who lives in
Arlington, Washington, testified that Winningham had known Houchin for roughly
a year and a half prior to her death. Wallem said that Houchin met Winningham
in June 2003 through an online dating service and that he moved in with Houchin
Arelatively
shortly after they started dating.@  According to Wallem, Houchin and Winningham
traveled to Washington to visit her over the Christmas 2004 holidays.  She said that during the trip, Winningham
proposed to Houchin and that Houchin accepted. 
Wallem said that a few days after the proposal, she Acaught
[Houchin] alone, and . . . asked her if she was going to have a prenuptial
agreement.@  Wallem recalled that Houchin told her that
when she approached Winningham about a prenuptial agreement, he became so angry
that he would no longer Atouch or kiss her after
that.@  Wallem said that shortly after the couple
returned to Texas, the engagement was off.

Wallem
testified that Winningham moved out of Houchin=s
house but later moved back in and that they were not getting married but rather
it was Ajust
going to be one day at a time, to see how it went.@  But she said Houchin again told him to leave
and that Winningham moved out.  Wallem
also testified that it was Houchin who helped Winningham finish school and
establish a practice at the clinic where Houchin worked.  Wallem said that Houchin believed that
Winningham, after their latest breakup, was living in the office, sleeping on a
couch at night.  Wallem said that Houchin
relayed to her that she had confronted Winningham about living in the office
and that Winningham had glared at her and stormed out.  Houchin, about a month before her murder,
told Wallem something that she found frightening:  A[Wallem],
you know, if anything ever happens to me, make sure the police talk to [Winningham],
look at [Winningham].@








Wallem
said that after Houchin caught Winningham living in the office, Houchin=s
dog disappeared in late June 2005. 
Wallem believed that Winningham had done something to the dog and that
after the dog had disappeared, Winningham and Houchin=s
relationship continued to erode and that the two were Afighting
in the office all the time.@  Wallem said that her sister told her that, Ahe
would act normal in front of everybody else, but when it was the two of them,
he would be ‑‑ he would just glare at her or say mean things.A  Wallem testified that Winningham called her
the Tuesday after Houchin=s body was found and told
her he was sorry that Houchin was missing, but that he also asked what the
police had determined.  Wallem testified
that, AAnd
at that time, I ‑‑ I didn=t
want to talk to him anymore.  I ‑‑
I just felt like he was trying to get information out of me, and I really didn=t
know anything.@

B.      Dr. Robert Mims

Dr.
Robert Mims, a psychiatrist who had been friends with Houchin for over eleven
years and worked with both Houchin and Winningham, also testified that Houchin
had helped Winningham establish his practice at the clinic.  Mims said that he knew of Houchin and
Winningham=s
romantic relationship but was initially surprised that they were engaged.  Mims said that because of other commitments,
he only worked at the clinic part-time and that Winningham shared his
office.  Mims testified that he learned
the couple were no longer engaged because he asked Winningham about the
engagement.  According to Mims,
Winningham responded that the engagement had ended because of Asomething
to do with Deborah and money, but he was vague.@  Mims said that Houchin later told him that
the engagement dissolved over Houchin=s
desire to have a prenuptial agreement. 
He said that the couple=s
tumultuous relationship created Aan
air of tension in the office.@

Mims
said that Houchin and Winningham got into a heated argument at the clinic on
the evening of Thursday, July 21, 2005. 
Mims stated that Winningham wanted the clinic=s
secretary and part-time receptionist, Teresa Singh, fired and that this was a
point of contention between Houchin and Winningham.  He said that Winningham was also upset that
Mims did not want to form a partnership and that Winningham blamed this on
Houchin.  By Mims=s
account, after the argument ended, Houchin was particularly upset.

Mims
said that a coworker contacted him on Monday, July 25, 2005, about Houchin=s
absence from the office.  The coworker
told Mims that she had tried to contact Houchin all weekend to no avail and
that Houchin had not shown up for her Monday morning appointments.  Mims recalled that it was at this time that
someone from the clinic contacted the police about Houchin.

Mims
testified that he came to the office on Tuesday, July 26, 2005, after learning
that the police had found Houchin=s
home in disarray and her dogs unattended. 
He said that he had also been informed that a body had been found in
Muenster.  Mims said that while everyone
in the office was generally distraught and upset, Winningham=s
demeanor was appreciably different.  Mims
also testified that he was unaware of where Winningham lived during the months
preceding Houchin=s death but that he later
learned that Winningham in fact lived in the apartments across the parking lot
from the clinic.

C.      Larry Kish

Larry
Kish, an investigator with the Denton County Sheriff=s
office, testified that he assisted the investigation regarding the discovery of
Houchin=s
body the morning of July 22, 2005.  Kish
testified about the Academy receipt he and Murphree had collected near the
body.  Similar to Murphree=s
account, Kish relayed how the receipt identified the issuing store as being
located in Arlington, Texas, with the store=s
number printed on it.  The purchase date
on the receipt was July 2, 2005, and two purchased items were listedCa
tarp and a rope.  Packaging for a rope
was also found near the body.  Kish said
that these two items were processed but that no fingerprints were found.  Kish also said that Houchin=s
body had been burned along with a blue tarp. 
Kish said that what looked to be a footprint was found near Houchin=s
body.  Kish said that he took a cast of
the possible print but that Ait
was very vague.@  Kish admitted that no one compared the print
to anyone=s
shoes.  Kish said he took a cast of what
appeared to be a tire print, but that casting was also never compared to anyone=s
vehicle, including Winningham=s
car.

Kish
said that when he visited the clinic, he was able to observe Winningham=s
vehicle in the parking lot.  According to
Kish:

On
the rear of the vehicle, I did a visual inspection of the vehicle, walked
around it.  And on the bumper, the back
of the bumper, the passenger side of the bumper, there [were] some scratches on
it, and there [were] some blue fibers actually imbedded into the plastic part
of the bumper.

 

D.      Dr. Jill Ervin

Dr.
Jill Ervin, a medical examiner at the office of the Dallas County Medical
Examiner in the Southwestern Institute of Forensic Sciences in Dallas County,
testified that Houchin=s body was identified
through dental records after she examined it. 
She said that Houchin=s
body had Aalmost
100 percent burns over the entire surface of the body.@  In addition to charred fragments of clothing
and jewelry on the body, Ervin said that there was also Asome
molten blue material that was consistent with a tarp.@  She also stated that the clothing fragments
consisted of a Acharred bra on her body@ and
Acharred
stockings on her right foot and leg.@

According
to Ervin, x-rays revealed a bullet in Houchin=s
corpse.  Ervin said she found evidence of
three different gunshot wounds on the bodyCtwo
in the lower back and one in the back of the right ribcage.  Ervin opined that the bullet to the ribcage
caused a fatal wound and that Houchin would have died within a half-hour of the
infliction of the wound.  Ervin said that
Houchin was not alive at the time she was set on fire.  She also testified that in order to burn a
human body, a source of fuel would be necessary.

E.      Bruce Tinch

Bruce
Tinch, owner of the building that housed the clinic and husband of one of the
clinic=s
counselorsCAmy
Tinch[1]Ctestified
at trial.  Tinch said that his wife and
Houchin were friends and that they had known each other roughly twenty-five
years. Tinch met Winningham through Houchin. 
By Tinch=s account, Houchin had brought
Winningham into the clinic=s
practice and Aintroduced him into the business
part.@ Tinch
said he watched Houchin and Winningham=s
relationship evolve from an Aelation,
idyllic form into basically a train wreck catastrophe.@  He said that during the months leading up to
Houchin=s death,
there were several Apublic arguments, public feuding,
anger.@  Tinch testified that the point in time that
the relationship went from Ajoy of an
engagement . . . into a tailspin@ occurred
after Houchin requested a prenuptial agreement. 
According to Tinch, the fighting was so bad that Athe
police were called to [the] office one day to break up a fight.@

Tinch
explained that one night in February 2005, when his wife Amy was in bed sick,
Houchin unexpectedly arrived at his house pounding on the door.  He said she had the look of Adisheveled
frightened terror.@ 
He said that Houchin told him, AI know
Amy=s
sick.  I just got to come over.  We=ve got to
talk.  We=ve just
got to talk.@ Tinch described how he tried to
calm Houchin down and how she said things like A[Winningham]
isn=t the
person that we thought he was@ and AI need
you to know ‑‑ I need someone to know that if anything ever
happens to me, it=s [Winningham].@ Tinch
said that Houchin explained that while she had a lot of money, Winningham had
none.  Houchin showed him paperwork that
she had brought with her indicating that Winningham had borrowed money without
paying it back.  He also said that
Houchin said, A>I think
he=s trying
to get my money=@ and she
referred to the prenuptial agreement. 
Tinch said that Houchin relayed that the prenuptial agreement was a key
issue in the decline of their relationship. 
Tinch explained that Houchin said she had kicked Winningham out of her
house, changed the locks, and acquired a gun. 
Tinch suggested to her that they go to the police, but she allegedly
replied, ANo, I can take care of myself.@

Tinch
explained how, after the breakup, Houchin had resumed Internet dating and had
gone around the office Atouting it around . . .
that she had 400 hits.@ 
Tinch said that Asomeone said that [Winningham]
had gotten very angry about that.@

Tinch
also described how on Monday, July 25, 2005, his wife had called him several
times, worried that Houchin had not arrived for work.  Compelled by her insistence, Tinch said that
he went to check Houchin=s house and that the police were
already there performing a welfare check. 
At the request of the police, Tinch agreed to care for Houchin=s
dogs.  Tinch also described what happened
at the office on Tuesday, July 26, 2005. 
He said that a group gathered at the office and Aeveryone
shared the same sentiment except one, and that was [Winningham].@ Tinch
said that while everyone else was Atense
[and] anxious,@ Winningham was emotionless.

Tinch
also said that on Wednesday, July 27, 2005, Winningham had an odd conversation
with him.  Tinch recalled that Winningham
was making statements like, AYou know
. . . I=m over her@ and, AShe=s been
calling me, and I=m over her. . . .
I found somebody else, and I=m not
interested . . . in her anymore.@  Tinch said that Winningham appeared defensive
about his relationship with Houchin and also said, A[Houchin]
was so proud that she had gotten 400 hits on the new dating service
. . . I don=t care about her.@  Tinch said that Winningham struck him as Ahugely,
horrificly odd@ when he told him that he had
called Houchin=s sister over the weekend and
told her that Houchin had been murdered. 
Tinch said that this specifically caught his attention because they did
not know Houchin had been murdered until Tuesday and Winningham specifically
said he had called Houchin=s sister
over the weekend. Tinch averred that the conversation alarmed him enough
that he informed one of the Texas Rangers what Winningham had said.

Tinch
said that Winningham=s behavior was so odd that he asked
Winningham to leave the clinic.  Tinch
testified that Winningham wore shorts when he removed his things from the
office a couple of weeks later, and Tinch noticed that Winningham had what
appeared to be fresh wounds on his shin as though a Ascab had
been taken off.@

Tinch
also recalled that prior to Houchin=s murder,
he had approached Winningham about where he lived because Houchin had informed
him that Winningham might be living in the office.  Tinch said that Winningham told him he was
living in Grand Prairie but that he learned later from investigators that
Winningham lived in the apartment Aover the fence
from the office.@ 
Tinch said that despite being only A40
seconds@ from the
office, Winningham would still drive his car to work.  Tinch testified that it was very clear to him
that Winningham did not want anyone to know where he lived.

F.       Alisa Sample

Alisa
Sample, who did insurance billing, testified that she had worked with Houchin
for a number of years.  Specifically,
Sample had handled billing statements for Houchin for the two years prior to
her murder and for Winningham since sometime in 2004.  Sample averred that she had a very good
rapport with Winningham.  Sample, who
worked mostly from home, said that Houchin=s normal
routine was to fax her Thursday Aday
sheets@ to
Sample on Sundays because Houchin did not work on Fridays.  According to Sample, Winningham sent his day
sheets each night.

Sample
said that Winningham was prompt and routine about his billing because it was
very important to him.  Sample testified
that the first time Winningham failed to submit his day sheets to her was the
evening of Thursday, July 21, 2005Cthe night
before Houchin=s body was found in
Muenster.  Sample said she called
Winningham on his cell phone that night somewhere between 10:30 p.m. and 11
p.m.  She said she left a message but
that Winningham did not return her call that night.  Sample said that Winningham contacted her on
Friday to inform her that he would be faxing his day sheets for both Thursday
and Friday but that he did not send them to her until Sunday.  She said that this was very unusual.  Sample also averred that Winningham told her
on Sunday he had seen a patient on Saturday and that she should bill out on
that patient.  Sample said that this too
was unusual because Winningham did not routinely see patients on Saturdays.

Like
others in the clinic, Sample testified that between the time Houchin was
thought to be missing and the time her body was identified, everyone else in
the clinic was Atrying to sort things out and
figure things out@ but that Winningham was not
participating.  Sample said that his not
participating struck her as odd.  Sample
testified that she found one particular exchange with Winningham chilling:

After I spoke with the morgue and I hung up the phone and told Amy
Tinch that we needed to get the dental records, I came forward to [Winningham]
and told him that they thought [Houchin] had been murdered.  And at that time, he stood right beside me,
and he asked how we figured this ‑‑ you know, how did we come
about this.  And his expression was, oh,
that=s ‑‑ that=s horrible, how would you
find that out. And that=s when I went on to tell
him that I felt like doors were opening up, and I was --  you know, one question to another, asked
another one, and led to one phone call and the next phone call and the next
phone call.  And he made the comment to
me as he was leaving, he was just real ‑‑ just stood there
like in shock basically, and you could see the expression on his face, and that=s when he tapped on my
shoulder, because [Winningham] and I have always worked well together and said,
>Well, aren=t you a real smart one.=

 

Sample
recalled that after the Arlington Police Department came to the office,
Winningham=s behavior concerning his
appointments became unusual and erratic: AHe
blocked off times, took off, canceled patients . . . just [said,] >I=m
leaving.  I=ll be
back.=
. . . [a]nd he was all day long marking out [appointments]
. . . That wasn=t like [Winningham] at all.@  She described his behavior as Avery
unusual.@  Sample was also surprised to learn where
Winningham lived.  She said that no one
knew he lived so close because Ahe drove
his car like normal to work as if he lived somewhere else.@

G.      Teresa Singh

Teresa
Singh, who worked with Houchin for more than fourteen years and served as the
clinic=s manager
and insurance verifier, testified that the general mood at the clinic on the
Monday and Tuesday after Houchin disappeared was one of confusion.  She also testified that she had visited
Houchin=s home
the weekend before she was murdered and that she had witnessed the stairs to
the second story and there was nothing unusual about the carpet on the stairs
at that time.  Singh said that Houchin
had told her that she was expecting a call the Thursday night before her body
was found.  Singh stated that she did not
remember the individual=s name but that it was not
Winningham.

H.      Gwen James

Gwen
James testified that she started working as one of the clinic=s
receptionists roughly three months before Houchin=s
murder.  One of her primary duties was to
keep Winningham=s schedule.  She said that Winningham was often Apretty
much booked solid@ and that he normally saw his
first patient at 8:15 a.m. Initially, James testified that Winningham called
her at approximately 8:15 a.m. on Friday, July 22, 2005Cthe
morning Houchin=s body was foundCto inform
her that he would be late.  James
testified that Winningham had an 8:15 a.m. appointment that morning and that he
ultimately arrived Ajust a few minutes late.@  But after reviewing Winningham=s
appointment book, James altered her testimony and said that Winningham called
her at 8:30 a.m. on Friday to inform her that he would be late and that
Winningham was in fact Aon time for his [9:15 a.m.]
appointment.@

Defense
counsel asked James when Winningham=s Ausual@ time to
arrive in the mornings was.  James said
that he would usually arrive by 8:15 a.m. 
Citing her statement to investigators, defense counsel asked whether she
had reported to the police that Winningham had arrived at his usual time.  James answered in the affirmative.  But when defense counsel asked James to
clarify, she again said that Winningham called her between 8:15 a.m. and 8:30
a.m. Friday morning to inform her he would be late and that he arrived sometime
between 9:10 a.m. and 9:20 a.m. James admitted that she never mentioned Winningham=s alleged
Friday-morning phone call to investigators.

James
testified that on the following Monday, Winningham called her again and asked
her to reschedule his morning appointments because he had errands to run.  She said that the phone call was unusual
because it was made to her cell phone, she had already been in the office for
thirty minutes, Winningham normally kept his appointments, and he had never
called her cell phone before.  She
testified that during the week after Houchin=s murder,
it became routine for Winningham to cancel or reschedule appointments.  James recalled that after Winningham had been
asked to leave the clinic, he came to pick up mail and told her that he knew he
was a suspect in Houchin=s murder.

I.        Byron Stewart

Detective
Byron Stewart of the Arlington Police Department=s
homicide unit testified that after Houchin was reported missing, he assisted
during a welfare check of Houchin=s
home.  Stewart described Houchin=s home:

The house was in a state of disarray, in my opinion, as far as couch
pillows thrown on the floor, clothing on the floor.  It appeared that dogs had urinated and
defecated throughout the house.  I did
see a purse along with a cell phone and keys and a wallet with credit cards in
it on the kitchen table.  It was --
there was a chewed‑up shoe, woman=s shoe, on the floor, things of that nature.

 

Stewart
explained that because he was performing a missing person=s welfare
check, he was initially focused on finding Houchin.  He said that he remained in the house for
roughly ten to fifteen minutes, surveying the house, looking for indications of
Houchin=s
whereabouts.  During his search, Stewart
noticed a computer running. He said that he touched the spacebar and the
computer displayed an internet dating site. 
According to Stewart, as he left the home, Tinch arrived and explained
that he believed that Houchin=s body
had been discovered.  Stewart said, A[s]o we
locked up the house, and we followed [Tinch] to [the clinic], and that=s when we
met with the entire . . . staff at this particular location.@

While
there, Stewart learned that Winningham was not at the meeting.
Stewart also learned that Winningham and Houchin had previously had a
romantic relationship and that their breakup had caused tension in the office.  Stewart said he asked someone to have
Winningham come to the meeting.  By this
time, Stewart had learned the gruesome details regarding the state of Houchin=s
body.  He said that he purposely
explained the body in Asomewhat graphic [detail] because
[he] wanted to see kind of the reaction [he] was going to get from everyone in
the room . . . they all kind of gasped, you know, and started showing
emotions, but [he] purposefully looked at [Winningham], and he showed no
emotion at that time.@ Stewart explained that based on
his experiences speaking with Afamily
members, loved ones, fiances, ex and present [about murder victims],@
Winningham=s behavior was Anot
typical of a person who probably just got the news that his former fiancee was
found murdered.@ 
Stewart said that he then gave his business card to Winningham, AI made a
point to point out my e‑mail to him and my numbers to him, and I also
made a point to told ‑‑ asked him to call me if he needed anything
from me at all.@

Stewart
said that Winningham did in fact e-mail and inform Stewart that he would be
traveling to Germany.  The e-mail
explained that Winningham would be leaving on August 9, 2005, and returning
August 16, 2005.  Stewart averred that
Winningham=s e-mail was odd because Ahe had no
emotions and didn=t offer to help in any kind of
way when@ he had
previously explained at the clinic that the body found in Muenster was believed
to be Houchin=s.  Stewart said that after reading Winningham=s e-mail,
he believed Winningham was going to flee the country but that he agreed that
Winningham was free to travel abroad because there was not an existing warrant
for his arrest.

J.       Cary Treff

Cary
Treff, Houchin=s brother who lives in
California, testified at trial as well. Treff said that he had initially been
informed by Amy Tinch that Houchin did not come to work on Monday.  Later, Tinch informed Treff that it was
Houchin=s body
that was found in Muenster.  Although
Treff knew of Winningham, he testified that the first time he met him in person
was when he traveled to Arlington after Houchin=s body
was found.  Treff said that he met
Winningham at the clinicCwhere Treff had gone to meet up
with Bruce Tinch.  Winningham gave Treff
his business card and said to call him if he ever Awanted to
talk about [Houchin].@ 
After Treff and Winningham had both attended Houchin=s
memorial service, Treff said that the two had arranged to meet the next day in
Winningham=s office because Treff Afelt a
desire to talk to him before [Treff] left town.@

According
to Treff, after making small talk, Treff asked Winningham, Aif he had
any idea who could have killed [his] sister?@  Treff said that Winningham then Acompletely
lost his composure.@ 
Treff recalled that AHe could
not look me in the eyes anymore.  He was
looking down and sideways . . . He stumbled with his words.@  Treff confronted Winningham about him not
wanting to talk to the police without an attorney:  AI asked
him, >Why?  Why won=t you
talk to the police? Everybody else has in this clinic.=@  Allegedly, Winningham responded, AWell,
under these circumstances, I think it=s
appropriate that I have an attorney.@  Treff pressed further asking, AWhat
circumstances?@ 
Then Treff said he directly asked Winningham, A[D]id you
kill my sister, [Houchin]?@  And Winningham=s
response was only that he had Adated her@ but was
not that he had loved her, been engaged to her, and lived with her.  Treff testified that the conversation left
him with a definite impression:

I knew he was a witness or a potential candidate that could have done
this, but based on him losing his composure to my question of do you know who
could have done this, I believed he did it at that point.  I believed he was the person that killed my
sister.

 

K.      Brent Chambers

Brent
Chambers, an FBI special agent and crime scene investigator, testified that he
assisted the Texas Rangers=
investigation; specifically, Chambers led the team responsible for collecting
evidence at Houchin=s home after it was determined
she had been murdered.  After giving a
basic description of Houchin=s house,
including its layout, Chambers testified about the condition of Houchin=s house.
According to Chambers, blood and bleach stains indicated that Houchin=s body
was dragged from the upstairs office, down the stairs, through the kitchen, and
into the garage.

Chambers
found bloodied eyeglasses in the living room. 
He also found an eyeglass chain at the bottom of the stairs.  In the office near the computer, Chambers
found a Aspent
round, a bullet, [with] what appeared to have blood on it, on the floor.@  In the bedroom, Chambers found a .357
revolver in the nightstand.

On
cross-examination, Chambers testified that there was a broken window that had
been boarded up in one of the rooms and that was not the result of either the
investigation or the welfare check. 
Chambers also testified that a cigarette butt and beer can were found
near the garage of Houchin=s house
and collected as evidence.  Although
Chambers testified that they were collected because A[they
m]ight have evidentiary value,@ he did
not elaborate on whatever became of these items.

L.       Jamie Becker

Jamie Becker,
a firearms and tool mark examiner for the Tarrant County Medical Examiner=s Office,
testified that she examined both bullets found during the investigationCthe one
found in Houchin=s body and the one found in the
office of [Houchin=s] home.  Becker said that both bullets were fired from
the same gun, a A.38-caliber class@
weapon.  Becker said, however, that the
bullets were not fired from the gun found in Houchin=s home.

M.      Monica Seagate

Monica
Seagate, an FBI special agent and crime scene investigator, testified that she
conducted the investigation of Winningham=s
apartment.  Seagate said that she found
an Academy bag Akind of balled up and pushed down
towards the floor behind [Winningham=s]
armoire and the wall.@ 
Inside the bag, Seagate found another torn Academy bag containing
rope.  When asked why she collected these
items, Seagate said, AAnytime you find rope wrapped up
and hidden in a bag behind an armoire, between the wall and a dresser smashed
down to the floor, it=s a little bit suspicious.@  She also said that she collected a pair of
Winningham=s shoes.

N.      Michael Hillman

FBI
special agent Michael Hillman testified that he forensically processed
Winningham=s car.  During processing, Hillman took photographs
of Winningham=s car which were introduced into
evidence.  He specifically testified
about scratches found on the back bumper and Ablue
filament@ lifted
from the grooves of the scratches.  Hillman
also said that there was a contrast between the condition of the interior of
the car and the interior of the trunk.

By
Hillman=s
account, AWhen you compare the condition of
the trunk to the condition of the passenger compartment, the trunk was very
clean.  The passenger compartment was
disheveled, had a lot of personal articles scattered throughout.@ Hillman
described that there were two trunk linersCa
permanent liner and a removal plastic liner that lies on top of the
permanent-cloth liner.  Regarding the
removable liner, Hillman said that it was Aa plastic
kind of drop mat that you can buy B
sometimes cars come with it; sometimes it=s an
aftermarket product ‑‑ that you can put into the car.  And if you spill a plant or if you=re
transporting potting soil back there, it kind of pops out, easier to clean the
interior of the trunk.@ 
Hillman testified about a portion of the cloth liner that had Aa
presumptive hit for blood@ on it.  He sent the liners for further testing.  Hillman found a flashlight and plastic bag
containing a funnel in the trunk.  He
also found a plastic packaging for gloves in the passenger floorboard, $1600,
and a folder containing passport information.

O.      Carolyn Van Winkle

Carolyn
Van Winkle, a forensic scientist for the Tarrant County Medical Examiner=s Office,
testified that she analyzed some of the items found in Winningham=s
car.  Specifically, Van Winkle testified
about blood stains found in Winningham=s
trunk.  In addition to a number of
identified Aweak[]@ blood
stains, Van Winkle said that there was a small distinct stain of bloodCapproximately
.5 centimeters in diameterCfound on
the outer cloth liner of the trunk.  She
said that the blood had Aactually soaked through to the
other side@ of the outer cloth liner. After
comparing the DNA profile from the distinct stain of blood found in Winningham=s trunk
to the DNA profile from a known sample of Houchin=s blood,
Van Winkle testified that the two were Acertainly
consistent@ with each other and that the
blood in the trunk tested positive for Houchin=s
blood.  According to Van Winkle, the
blood from Winningham=s trunk Awas the
same as [Houchin=s] profile@ Aat all
the different 13 locations@ for verifying
DNA consistency.  Van Winkle said that
there was no way to determine how long the blood had been in the trunk, but
because it had soaked through the liner, she averred that the blood was in
liquid form when it was exposed to the trunk=s
interior.  Furthermore, Van Winkle said
that because DNA material begins to immediately degrade once it is left, the
blood would not have been years old; at most, it could have possibly been
months old.

Van
Winkle also testified to the biological material found on the bullet recovered
from Houchin=s home.  Van Winkle said that Abarring
any identical sibling contributor,@ the
biological material found on the bullet came from Houchin.

P.      Stephanie Parrot

Stephanie
Parrot, an administrative passport clerk for the Tarrant County District Clerk=s Office,
testified that during July 2005 she was working in the Arlington subcourthouse
verifying passport applicants=
documentation.  She said that normally a
passport application takes six weeks to process but that applicants can
expedite the process and receive their passports in as little as two
weeks.  Parrot recalled that Winningham
came in to apply for an expedited passport on Friday, July 22, 2005. She
remembered Winningham specifically because he came in Avery late
in the day, and I only remember that because we close at 4:30, and I was ready
to leave for the day when he came in.@  She also remembered that although Winningham
wanted Ato leave
in less than 14 days,@ he did not have Aproof
that he needed to leave the country@ so
quickly.  In sum, Parrot testified that
she did not process Winningham=s request
for a passport because he Adidn=t have
everything he needed on that day.@ She said
that Winningham returned on Tuesday, July 26, 2005, still wanting an expedited
passport, but that this time he had proper documentation.  When Winningham returned with an itinerary,
Winningham filled out an application. According to the application, Winningham
wanted to travel to Germany, Italy, and Switzerland, leaving August 9,
2005.  Parrot identified Winningham, as
he sat in the courtroom, as the person who came in on both Friday, July 22,
2005, and Tuesday, July 26, 2005.

Q.      Brad Harmon

Texas
Ranger Brad Harmon testified that he was called in to investigate when Houchin=s body
was found but not yet identified. 
Specifically, he investigated the Academy receipt.  Harmon testified that the information from
the receipt led him to an Academy sporting goods store located within ten miles
of the clinic and Winningham=s
apartment.  Because the store did not
have surveillance cameras and because the clerk who had handled the transaction
regarding the receipt did not remember the transaction, Harmon was unable to
initially place Winningham at the Academy store.

During
the investigation, Harmon accompanied Murphree and Kish during their initial
visit to the clinic.  Harmon said that
while outside the clinic, Kish pointed out the scratches with blue material
located on Winningham=s bumper.  Harmon described the scratches as vertical
and containing Ablue transfer material.@

Based on
his knowledge of the blue tarp found on Houchin=s body
and the blue material found on Winningham=s car,
Harmon purchased a blue tarp from the Academy store in Arlington.  Consistent with the Academy receipt, the tarp
Harmon purchased was ten-by-sixteen feet. 
Harmon testified that the size of the tarp would have allowed a person
to wrap Houchin=s body inside it after she was
shot and killed. With Harmon=s
assistance, the State demonstrated that the tarp fit within the Academy bag
that investigators found behind Winningham=s
armoire.  On cross-examination, Harmon
admitted that, other than that found on the bumper, no remnants of anything
resembling a blue tarp were found in Houchin=s home or
anywhere else in Winningham=s car.

Harmon
said that Winningham, through his attorney, contacted him on August 3, 2005,
about meeting and discussing Houchin=s
case.  Harmon testified that they
obtained a search warrant for Winningham=s car
while en route to the attorney=s
office.  During their interview, Harmon
observed Winningham and said that when he was asked about Academy, a tarp, and
rope, Winningham Awas surprised, kind of
shocked.  A -- you could see a
definite change in his demeanor.@  Harmon found Winningham=s
reaction significant.  After being
questioned about Academy, Winningham admitted that he had been to the Academy
store that Harmon had investigated.  When
asked what he had purchased, Winningham said he had purchased socks.

Harmon
also said that prior to Houchin=s
funeral, investigators were able to use cellular technology to trace Winningham=s cell
phone.  They learned that Winningham had
traveled to New Mexico after investigators initially visited the clinic but
that he had returned for Houchin=s funeral.

R.      Patricia Eddings

Patricia
Eddings, senior trace analyst for the Tarrant County Medical Examiners= crime
lab, testified that she compared the blue material lifted from Winningham=s bumper
with a control tarp and debris from the tarp that was burned around Houchin=s
body.  When asked to describe the
materials lifted from Winningham=s bumper,
Eddings referred to them as Asmears.@  When asked why she referred to them this way
she said:

Well, I think that more accurately depicts what it does look like.  It looks like a material that had some force
behind it that actually impacted the surface of this bumper and then went
across the area in a linear direction. 
It=s not like ‑‑
because all ‑‑ all of [the transfers], as you look at them,
are more heavily concentrated kind of toward the center, like it didn=t have as much force at
first, but then the middle point is where the greatest point of impact was,
transferring most material, then it was coming off with lesser material on the
edges.

 

Eddings said that she performed
visual, microscopic, and spectrometry examinations of the material found in the
lifts taken from Winningham=s
bumper.  Eddings concluded that the
material from the lifts was the same material and color and had the same
spectral patterns as the control tarp and the debris found on Houchin=s
body.  She also stated that the control
tarp and debris had Athe [same] ability to form a film
when force is applied to them@ and
smeared upon a surface as the material found in the lifts.  Eddings admitted that Athis
[was] the first time [she] had done a comparison with this type of plastic on
the back of a car@ during her over thirty years of
experience.  And Eddings also said that
she was unaware of the amount of force that would be required to smear the tarp
material onto a car=s bumper.  Eddings said that her office had determined
that the rope found on Houchin=s body
and the rope found in Winningham=s
apartment were not the same rope.  She
also testifed that some of the hair found in Winningham=s trunk
was dog hair and the other hair was brown body hair of Caucasian origin.

S.      Steve Stockdale

Steve
Stockdale testified for the defense. 
Stockdale said that he participated in online dating and that he had
exchanged e-mails with Houchin. 
According to Stockdale, he and Houchin had two brief phone conversationsCone of
which occurred on July 21, 2005.

T.      George Baab

The
defense also called George Baab, another witness who had met Houchin
through online dating.  Baab said that he
and Houchin originally had planned to meet in person for the first time the
evening of Friday, July 22, 2005, but Houchin called on July 21 during the day
and canceled stating, AThere=s
something I thought I had cleared up, but it=s not,
and we=ll have
to postpone and reschedule.@  She asked him to call her again over the
weekend to reschedule.  Baab said that he
tried to call her on the weekend but could not get in touch with her.

U.      Amy Jaggers

Amy
Jaggers testified that she met Winningham on an Internet dating site in June
2003.  Jaggers declined to categorize her
relationship with Winningham as dating but said that in addition to eating out
and Ajust
visit[ing] in [her] home or at a restaurant or something,@ she also
took the opportunity to learn from Winningham and help him score psychological
tests.  She recalled that Winningham
called her just after midnight of July 22, 2005, for a brief phone
conversation.  She said she did not know
where he was, but he told her that he had just been runningCan
activity she said he enjoyed.

Jaggers
said that she traveled to Munich, Germany, on August 9, 2005, to see her
brother, who had given her and her daughter tickets.  According to Jaggers, she had planned to go
since Christmas 2004 and told Winningham of her plans in January 2005.  She said that she invited Winningham to join
them.  Jaggers invited Winningham again
in May 2005, but Winningham said he was unsure if he could go. She said that
Winningham did not make arrangements initially, but then, on Saturday, July 23,
2005Cthe
Saturday after Houchin was murderedCWinningham
saw her passport and asked when she was going. 
After informing him again that she was going August 9, she again asked
if he wanted to go along, and he said, AWell, I
don=t
know.  I doubt that I can get tickets
this late.@ 
She said that they started looking for tickets Saturday night.  Jaggers said that she asked whether his
passport was current and that it was then that Winningham indicated he was
going to have to get his passport renewed.

V.      Sonny Brownlee

Sonny
Brownlee, a private investigator for the defense, testified that he met with
Craig Bayer where Bayer had found Houchin=s body in
Muenster.  Brownlee testified that when
he returned, he drove from that location to the clinic in Arlington. He drove
the same route again on a Friday morning and left at 6:30 a.m.Croughly
the same time of day Bayer discovered Houchin=s
body.  Brownlee said that while driving
the speed limit, the trip took him one hour forty-five minutes and that the
distance between where Houchin=s body
was found and the clinic was ninety miles. Brownlee also said that he was aware
that Winningham=s first appointment on Friday,
July 22, 2005, was scheduled for 9:15 a.m.

W.     Lester Winningham, Jr.

Winningham
testified at trial.  He acknowledged that
he and Houchin had been engaged but stated that he did not kill her.  He told how he and Houchin had met through an
online dating service.  According to
Winningham, after the two had dated, he moved in with her.  And he stated that after living together for
roughly nine months, he proposed to her at her sister=s house
in Washington over Christmas. Winningham said that during the time he lived
with Houchin, he had moved out three times before ultimately moving out for
good on April 15, 2005.  Winningham said
that he was not bothered by Houchin=s request
for a prenuptial agreement; rather, the relationship ended because of Aconflicts
we had at the office.@

Although
claiming that he did not owe her money, Winningham said he did write checks to
Houchin to help her with her mortgageCspecifically
citing a check written to her for over $1,000 in early July.  But he later testified that he was mistaken
about why he had written her the check and that it was in fact for business
expenses.  He said that even though he
saw her a lot at work, he didn=t have
much contact with Houchin outside of work after their final breakup on April
15.

Winningham
explained that the reason others did not know where he lived was intentional
because Houchin Aand I were having a lot of
problems.  I felt like it was best that
she [and the others] not know where I lived, because I felt like she would
initiate contact . . . that she might stop by, and I was -- I
didn=t want
that to happen.@ 
Winningham said that he did have an argument with Houchin on July 21,
2005, over staff-related matters.  He
testified that after the argument, he drove back to his apartment.  Two hours later, Winningham called Amy
Jaggers because he had Asome tests that needed to be
scored.  I was getting behind.  She had helped me before.@

Winningham
said that he first learned of Houchin=s
disappearance the Monday following her murderCJuly 25,
2005.  By Winningham=s
account, no one was concerned on Friday that Houchin might be missing because
she did not work Fridays.  His testimony
was that even though his first appointment was set for 9:15 a.m. on Friday,
July 22, 2005, he arrived for work Aabout
8:10 or 8:15.@ 
Winningham denied ever going to the passport office that Friday.  After his appointment book and progress notes
were admitted into evidence, Winningham testified that he could not have been
at the passport office because he had a 4:15 p.m. appointment on Friday, July
22, and he took progress notes of the patient he counseled.  He explained that he had gone to the passport
office twice on Tuesday because he lacked his itinerary, and that Parrot Awas just
a little confused.@ 
When pressed by the prosecutor to explain at what times he went on
Tuesday, he could not remember exact times but said that he Awent to
[his] apartment and got the itinerary . . . and then went back.@
Winningham admitted that his appointment book did not always reflect reality,
because even though his appointment book indicated he had a confirmed
appointment for July 28, 2005, at 9:15 a.m., he was in fact withdrawing $20,000
cash from his checking account at about that time on that date.

Winningham
also disputed testimony that he called Houchin=s sister
over the weekend before authorities had learned that it was Houchin=s body
found in Muenster.  Winningham testified
that his phone recordsCadmitted into evidenceCdemonstrated
that he made a call to Houchin=s sister
on Tuesday, July 26, but that no calls had been made to her previously.  Again referring to his cell phone records,
Winningham said that he also never called the clinic on Friday morning to
inform the receptionist he would be late. 
Winningham=s phone records corroborated his
testimony.

Winningham
said that he planned to travel to Germany in August 2005 and purchased his
ticket on Sunday, July 24, 2005.  But he
said that he did not apply for a passport until the Monday after he purchased
his ticket.  He said that he informed
investigators about his intention to travel as a Acourtesy@ in case
they wanted to talk to him.  When asked
whether he took the trip to Germany, Winningham said, AWell, I
had decided that since I had been arrested, probably wouldn=t be a
good idea to go to Germany.@

Winningham
explained his reasoning for securing an attorney before he was arrested:

Well, I felt that under the circumstances, I ‑‑ [Houchin]
was ‑‑ had been murdered.  I
knew that I had a previous relationship with her, I knew that we were having
conflict in the office, and I knew that I was in my apartment that Thursday
night, the 21st.  I was by myself.  And I thought it would be a good idea, before
I talked to the police, that I get an attorney.

 

 








Pertaining
to his large cash withdrawal, Winningham said that he took $20,000 cash out of
his account to obtain a lawyer. 
Winningham told how he joined a fitness club on July 23, 2005, and even
wrote a check for membership fees.  He
also recalled that he wrote checks for his electric bill, fees for a birth
certificate, and credit union fees after Houchin had been murdered.  Winningham testified that the birth
certificate was obtained in relation to his pursuit of a passport.  Winningham=s
explanation for why he withdrew cash for an attorney, as opposed to writing a
check like he did for the other expenses, was, AI didn=t know if
[an attorney would] take a check [or] if they wanted cash.  I don=t know
how lawyers work in murder cases.@

According
to Winningham, he traveled to New Mexico by himself because he felt the need to
get away.  He said he returned when he
learned when Houchin=s funeral would be held.  Winningham said that he had no idea how
Houchin=s blood
got into his trunk or how the blue material made its way onto his bumper.
Winningham admitted that Houchin=s dogs
had previously taken rides in his car, but he denied they were ever in the
trunk.  He said that he never saw blue
material or scratches on his bumper and testified that he had filed a sworn
statement that Texas Ranger Murphree and investigator Kish=s
observations of the alleged material were Ablatantly
false.@  Winningham said that he canceled appointments
in the days following Houchin=s murder
because he was shocked and could not concentrate after learning what had
happened.

Winningham
also discussed e-mails Houchin sent him where she indicated that she was sorry
about their tumultuous relationship and that she wanted things to be calm
between them.  In the e-mails, Houchin
expressed that she wanted to see him and was willing to have an intimate
relationship without commitment. Winningham said he told her he was in another
relationship.

After
closing arguments, the jury deliberated for approximately four hours and then
returned a verdict of guilty.  A
punishment trial followed, and the trial court sentenced Winningham to life
imprisonment.  This appeal followed.

III.  Discussion

In two
points, Winningham challenges the legal and factual sufficiency of the evidence
to support the jury=s verdict that he murdered
Houchin.  A person is guilty of murder if
he (1) intentionally or knowingly causes the death of another, or
(2) intends to cause serious bodily injury and commits an act clearly
dangerous to human life that causes the death of an individual.  See Tex. Pen. Code Ann. ' 19.02
(Vernon 2003).  The court of criminal
appeals recently held that there is Ano
meaningful distinction between the Jackson v. Virginia legal-sufficiency
standard and the Clewis factual-sufficiency standard@ and that
the Jackson v. Virginia standard is the Aonly
standard that a reviewing court should apply in determining whether the
evidence is sufficient to support each element of a criminal offense that the State
is required to prove beyond a reasonable doubt. 
All other cases to the contrary, including Clewis, are overruled.@  Brooks, No. PD-0210-09, 2010 WL
3894613, at *8, *14.  Accordingly, we
will apply the same standard of review to both of Winningham=s
sufficiency complaints.

A.      Standard of Review

In
reviewing the sufficiency of the evidence to support a conviction, we view all
of the evidence in the light most favorable to the prosecution in order to
determine whether any rational trier of fact could have found the essential
elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307,
319, 99 S. Ct. 2781, 2789 (1979); Clayton v. State, 235 S.W.3d 772,
778 (Tex. Crim. App. 2007).  This
standard gives full play to the responsibility of the trier of fact to resolve
conflicts in the testimony, to weigh the evidence, and to draw reasonable
inferences from basic facts to ultimate facts. 
Jackson, 443 U.S. at 319, 99 S. Ct. at 2789; Clayton,
235 S.W.3d at 778.  The trier of fact is
the sole judge of the weight and credibility of the evidence.  See Tex. Code Crim. Proc. Ann. art.
38.04 (Vernon 1979); Brown v. State, 270 S.W.3d 564, 568 (Tex. Crim.
App. 2008), cert. denied, 129 S. Ct. 2075 (2009).  Thus, we may not re-evaluate the weight and
credibility of the evidence and substitute our judgment for that of the
factfinder.  Dewberry v. State, 4
S.W.3d 735, 740 (Tex. Crim. App. 1999), cert. denied, 529 U.S. 1131
(2000).  Instead, we Adetermine
whether the necessary inferences are reasonable based upon the combined and
cumulative force of all the evidence when viewed in the light most favorable to
the verdict.@ 
Hooper v. State, 214 S.W.3d 9, 16B17 (Tex.
Crim. App. 2007).  We must presume that
the factfinder resolved any conflicting inferences in favor of the prosecution
and defer to that resolution.  Jackson,
443 U.S. at 326, 99 S. Ct. at 2793; Clayton, 235 S.W.3d at 778.

The
sufficiency of the evidence should be measured by the elements of the offense
as defined by the hypothetically correct jury charge for the case, not the
charge actually given.  Hardy v. State,
281 S.W.3d 414, 421 (Tex. Crim. App. 2009); Malik v. State, 953 S.W.2d
234, 240 (Tex. Crim. App. 1997).  Such a
charge would be one that accurately sets out the law, is authorized by the
indictment, does not unnecessarily restrict the State=s
theories of liability, and adequately describes the particular offense for
which the defendant was tried.  Gollihar
v. State, 46 S.W.3d 243, 253 (Tex. Crim. App. 2001); Malik, 953
S.W.2d at 240.  We may not, however,
affirm a conviction based on legal or factual grounds that were not submitted
to the jury.  Malik, 953 S.W.2d at
238 n.3.  The law as authorized by the
indictment means the statutory elements of the charged offense as modified by
the factual details and legal theories contained in the charging
instrument.  See Curry v. State,
30 S.W.3d 394, 404 (Tex. Crim. App. 2000). 
The standard of review is the same for direct and circumstantial
evidence cases; circumstantial evidence is as probative as direct evidence in
establishing the guilt of an actor.  Clayton,
235 S.W.3d at 778; Hooper, 214 S.W.3d at 13.

B.      The Evidence is Sufficient to Support Winningham=s
Conviction

Viewing
the evidence in the light most favorable to the verdict, the record
demonstrates that Houchin was killed in her home officeCmedical
examiners testified that the bullet found in Houchin=s home
office contained Houchin=s DNA, and x-rays revealed a
bullet lodged in Houchin=s body; additionally, a firearm
expert testified that both bullets were fired from the same gun.  From there, Houchin was dragged down the
stairs, through the kitchen, and into the garage.  Then, Houchin=s bodyCwrapped
in a tarpCwas transported to Muenster where
her body and the tarp were purposely burned. 
The State provided evidence that the inside of Winningham=s trunk
contained dog hair, human hair, and Houchin=s
blood.  Blue material was smeared into
scratch-like grooves of Winningham=s bumperCindicating
that a blue object forcefully contacted the bumper.  Also, the interior of Winningham=s car was
in disarray, in contrast to the pristine condition of his trunk. The jury could
have reasonably inferred that Houchin=s body
was once in Winningham=s trunk, wrapped in a blue tarp,
and that the blue smear marks were caused by her body being placed in or pulled
out of his trunk.  The jury could have
also inferred that Winningham cleaned his trunk to hide evidence that he
disposed of Houchin=s body after placing her in his
trunk.  The record also demonstrates that
Houchin was murdered after a tumultuous relationship with Winningham and
shortly after a heated public feud. 
Testimony at trial indicated that Winningham was particularly upset with
Houchin about both their work and private relationships.  A receipt from an Academy sporting goods
store was found near Houchin=s
remains, tying the tarp that her body was placed in to an Academy store in
Arlington. Winningham lived within ten miles of the store where the tarp was
purchased.

Out of
his normal routine, Winningham failed to submit his pay sheets to the clinic=s
insurance billing assistant the night Houchin was murdered; and he called the
clinic=s
receptionist on Friday morning, informing her that he would be late.  The jury could have reasonably inferred that
Winningham=s varied conduct on the night of
Houchin=s murder
and the day following meant that he had murdered Houchin the night before and
was driving back from Muenster after disposing of her body Friday morning.

After
Houchin was murdered, Winningham attempted to obtain an expedited passport
before anyone at the clinic knew Houchin was missing.  After being denied a passport because he
lacked an itinerary, Winningham decided that he would accompany Jaggers during
her travels to GermanyCdespite having twice-previously
declined to accompany her.  After buying
tickets, he returned, itinerary in hand, and again attempted to obtain an
expedited passport.  Winningham also
withdrew a large amount of cash shortly after Houchin was murdered.  The jury could have reasonably inferred that
Winningham was planning to flee the country even before Houchin=s
coworkers knew she had disappeared.  See
Gosch v. State, 829 S.W.2d 775, 783 (Tex. Crim. App. 1991) (holding that
evidence of withdrawing cash with intent to flee country probative of intent to
murder), cert. denied, 509 U.S. 922 (1993).  The jury could have further determined that
Winningham demonstrated a consciousness of guilt and that he was lying when he
testified that he did not call the office the morning of Houchin=s murder
and did not attempt to obtain a passport that same Friday, when other witnesses
testified to the contrary.  See
Couchman v. State, 3 S.W.3d 155, 163B64
(Tex.  App.CFort
Worth 1999, pet ref=d) (reasoning that a jury can
infer that a defendant demonstrated a Aconsciousness
of guilt@ by lying
about events surrounding the alleged crime); see also Wright v. West,
505 U.S. 277, 296, 112 S. Ct. 2482, 2492 (1992) (reasoning that the jury could
disbelieve defendant=s uncorroborated and confused
testimony@ and that the jury Awas
further entitled to consider whatever it concluded to be perjured testimony as
affirmative evidence of guilt@); Padilla
v. State, --- S.W.3d ---, 2010 WL 3894785, *4 (Tex. Crim. App. Oct. 06,
2010) (AA
rational trier of fact could also consider such untruthful statements by
appellant, in connection with the other circumstances of the case, as
affirmative evidence of appellant=s guilt.@)  Viewing the evidence in the light most
favorable to the jury=s verdict, we hold that a
rational trier of fact could have found that the testimony of the witnesses and
other evidence at trial were sufficient to establish the elements of murder
beyond a reasonable doubt.  See
Jackson, 443 U.S. at 326, 99 S. Ct. at 2793; Clayton, 235 S.W.3d at
778; see also Tex. Penal Code Ann. ' 19.02(b)(1)B(2)
(listing elements of murder). 
Accordingly, we hold that the evidence is sufficient to support
Winningham=s conviction and overrule both of
his points.

IV.  Conclusion

Having
overruled both of Winningham=s points,
we affirm the trial court=s judgment.  Winningham=s motion
for setting bail is now moot; accordingly, the motion for bail is denied.

 

 

BILL MEIER

JUSTICE

 

PANEL:  DAUPHINOT, GARDNER, and
MEIER, JJ.

 

DAUPHINOT, J. filed a dissenting opinion.

 

PUBLISH

 

DELIVERED:  October 21, 2010

 

 

 











 
 
 
 
 
 
 
 
 
 
 
 
 
  
 




 

 

 

 

                                COURT
OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

                                                 NO.
2-07-389-CR

 

 

LESTER WINNINGHAM, JR.                                                              APPELLANT

 

                                                             V.

 

THE STATE OF TEXAS                                                                             STATE

 

 

                                                       ------------

 

              FROM
THE 371ST DISTRICT COURT OF TARRANT COUNTY

 

                                                       ------------

 

DISSENTING OPINION ON

PETITIONS FOR
DISCRETIONARY REVIEW

 

                                                       ------------

On
original submission, I joined the majority=s
holdings that the jury=s verdict is clearly wrong
because the evidentiary scale tips radically toward a negative finding that
Appellant Lester Winningham, Jr. either intentionally or knowingly caused the
death of Deborah Houchin; that the verdict is contrary to the law and the evidence;
and that, based on the record before us, Appellant=s
conviction is clearly wrong and manifestly unjust.  I dissented from the majority=s
holding that the evidence is nonetheless sufficient to support Appellant=s
conviction under Jackson v. Virginia.[1]

More than
twenty years ago, the Texas Court of Criminal Appeals announced,

Adherence to the no evidence standard is now, and
has been for the last decade, expressly forbidden by Jackson.  It is no longer permissible to merely quote
the Jackson standard and then to turn around and apply the Thompson
no evidence standard as we have historically done.  Therefore, we expressly overrule that part of
Combs that relied upon the no evidence language quoted from Banks
to denote the incorrect standard of review for sufficiency of the evidence
three years after Jackson.  To
recapitulate, the test as delineated in Jackson requires us, as the
reviewing court, to determine whether after viewing the evidence in the light
most favorable to the prosecution, any rational trier of fact could have found
the essential elements of the crime beyond a reasonable doubt.

 

We must take each case and review the entire body
of evidence to determine whether the State has proven beyond a reasonable doubt
each and every element of the alleged crime and not just a plausible
explanation of the crime.[2]

 

 

Clearly,
although we view the evidence in the light most favorable to the prosecution,
we are mandated to consider not exclusively the evidence supporting the verdict
but the entire body of evidence to determine whether the State has proven each
and every element of the offense beyond a reasonable doubt.  It is not sufficient that the State provide
just a plausible explanation of the crime.

In the
case now before this court, the State proved a plausible explanation of Houchin=s murder,
but I could not on original submission and cannot now glean from the record the
evidence that would allow a rational trier of fact to conclude that the State
proved each and every element of the murder by shooting with a firearm beyond a
reasonable doubt.

Because
this is a circumstantial evidence case, I believe we must look at the historic
development of circumstantial evidence law in this state.  For scores of years, our courts recognized
that

[a] conviction on circumstantial evidence cannot be sustained if the
circumstances proven do not exclude every other reasonable hypothesis except
that of the guilt of the accused; and proof amounting only to a strong
suspicion or mere probability is insufficient.[3]

 

In 1983,
the Texas Court of Criminal Appeals announced in Hankins v. State that
juries should no longer be instructed on a separate circumstantial standard.[4]
This shift was based on the fact that direct and circumstantial evidence are
equally probative.[5]  But after its decision in Hankins, the
Texas Court of Criminal Appeals reiterated in Carlsen,

By the nature of circumstantial evidence, in order to determine it
rationally establishes guilt beyond a reasonable doubt, a process of
elimination must be used.  Illustrative
is Taylor v. State.  We there
cited the Jackson Astandard for review;@ in actually assessing the
evidence, no method other than a process of eliminating the guilt of
others under the evidence could be fashioned to effectively conclude the
evidence rationally established Taylor=s guilt beyond a reasonable doubt.  Stated in the converse, if the evidence
supports an inference other than the guilt of the appellant, a finding of guilt
beyond a reasonable doubt is not a rational finding.[6]

 

The concurrence in Carlsen agreed with the majority that

 

[l]ogic dictates that if there is a Areasonable hypothes[i]s@ other than the guilt of
the accused, then it cannot be said that the guilt has been shown Abeyond a reasonable doubt.@  In Hankins v. State, we recognized
that direct and circumstantial evidence were to be treated with equal
dignity.  Thus, any effort to weave into
the standard of appellate review any exception or difference or special
treatment for one type of evidence or the other will fail for lack of logic.[7]

 

The Texas Court of Criminal
Appeals continued to struggle with this issue and concluded on rehearing in Freeman
v. State,

Moreover, scrutiny of the analysis suggested in the
motions for rehearing (that the focus of our inquiry should be on Aany evidence which could
rationally support the verdict@) reveals it to be functionally indistinguishable
from that specifically rejected by the Supreme Court in Jackson as
violative of the Fourteenth Amendment.

 








Finally, as the motions for rehearing persuasively
argue, this Court=s opinions have never held
the circumstantial evidence analysis constitutes a different standard
for review from that to be ultimately applied in direct evidence
cases.  If the State=s evidence supports an
inference other than a finding of the essential elements of the crime, then no
trier of fact could rationally find the accused guilty beyond a
reasonable doubtCand this is true
irrespective of the character of the evidence.

 

In sum, we are convinced there are no better
analytical guidelines for assaying whether a rational trier of fact could have
found the essential elements of the crime beyond a reasonable doubt in any
given conviction had upon circumstantial evidence than those we currently
employ.[8]

 

In a footnote, the opinion on
rehearing acknowledged,

It is true that some opinions of the Court have
quoted language apparently originating from the pen of an author or editor of Texas
Jurisprudence to the effect that in circumstantial evidence cases an
appellate court will Areview the evidence in
light of the presumption that the accused is innocent[.]@

 

Literally and technically inaccurate, the
statement is revealed as a writer=s attempt to convey the notion that the State=s burden of adducing proof
beyond a reasonable doubt is but a conceptual corollary of the presumption of
innocence, and a failure to produce that evidentiary quantum operates to
absolve the appellant.[9]

 

The Texas Court of Criminal
Appeals then revisited the circumstantial evidence issue in Geesa,
reversing its holding in the Carlsen line of cases but recognizing the
problems the reversal created:

As Judge Clinton succinctly put it, Athe accused is stripped of the benefit of a charge
on circumstantial evidence and then loses the protection of a definition on
reasonable doubt.@[10]

 








 

The Geesa
court attempted to correct the new problem by providing a definition of beyond
a reasonable doubt,[11] but the Geesa
instruction did not resolve the problem of an analytical construct for
appellate review in a case where there was some evidence supporting the jury=s
verdict, but the verdict was clearly wrong. Rather than return to the old
circumstantial evidence construct, the Texas Court of Criminal Appeals imported
a factual sufficiency review in Clewis v. State.[12]

Giving
lip service to the clear warning in Jackson that no appellate court
should ever apply a no-evidence standard of review,[13]
and having adopted a factual sufficiency review similar to the civil factual
sufficiency review, appellate courts appear to have been willing to hold jury
determinations legally sufficient if there was any evidence whatsoever to
support the verdict.  That is, appellate
courts in practice were applying a no-evidence standard of legal sufficiency
because they could fall back on a factual sufficiency review to overturn
unsupported verdicts, yet give the State another chance to convict the
accused.  That is, even though the
evidence to support conviction was insufficient, or, stated another way, the
prosecution had failed to sustain its burden of proof, the appellate courts
could remand the case for retrial by holding that the evidence was factually,
as opposed to legally, insufficient.

In 2000,
the Texas Court of Criminal Appeals reversed the Geesa requirement of a
jury instruction on the definitions of Abeyond a
reasonable doubt@ and Areasonable
doubt.@[14] 
But the factual sufficiency review survived until October 6, 2010, when
the Texas Court of Criminal Appeals recognized in Brooks that the legal
and factual sufficiency standards Ahave
become essentially the same standard and that there is no meaningful
distinction between them@ and held that the Jackson
standard is the only standard that appellate courts should apply in determining
the sufficiency of the evidence to support an accused=s
conviction.[15]

If the
prosecution fails to prove an essential element of the offense charged in the
indictment and presented in the jury charge, the prosecution fails to sustain
its burden under the Jackson standard. 
Further, if an eyewitness identifies A as the culprit, but a videotape
shows that the offender is B, a jury who convicts A does not act rationally.[16]  Under the old Clewis standard,
reversal would be required because the evidence was factually insufficient, but
the case would be remanded for a new trial.[17]  Neither Jackson nor double jeopardy
protections permit retrial.[18]  Again, Jackson prohibits a no-evidence
standard of review.

In the
case now before this court, the majority previously determined that no rational
trier of fact could have found that the prosecution proved beyond a reasonable
doubt that Appellant committed each and every element of murder by shooting
Houchin with a firearm.  Respectfully, I
believe the majority applied a no-evidence standard in determining that the
evidence was legally sufficient in its original opinion.  Now, the majority conscientiously remains
consistent by holding the evidence sufficient. 
I believe that this holding is at odds with an analysis of the facts
under Jackson.

The Brooks
court did not mandate that appellate courts abandon a factual analysis of the
evidence.  Rather, the Brooks court
reminded us that the Jackson standard is consistent with Aconstitutional
and statutory mandates@ that appellate courts review
both Aquestions
of law@ and Aquestions
of fact.@[19] 
To comply with Jackson, we must view all the evidence, but we
must view that evidence in the light most favorable to the prosecution and
determine whether the evidence is sufficient to permit a rational trier of fact
to find the prosecution proved beyond a reasonable doubt that the accused
committed each and every element of the offense alleged. The majority
previously held that the verdict shocks the conscience because it is clearly
wrong and manifestly unjust.  The
justification for the conflict in the majority=s
previous conclusions is the change in vantage point formerly required by
factual and legal sufficiency reviews. 
But a verdict that shocks the conscience and is clearly wrong and
manifestly unjust cannot be salvaged by viewing the evidence, or absence
thereof, from a different perspective.

In the
first week of April 2004, Appellant moved in with Houchin in Arlington,
Texas.  Houchin and Appellant had
disagreements, and Appellant moved out three times before he left the final
time on April 15, 2005.  Houchin changed
the locks on her doors.  While they lived
together, but before April 15, 2005, they became engaged but broke off the
engagement, and Houchin complained to others when she became angry with
Appellant.

Bruce
Tinch=s very
dramatic testimony of Houchin=s visit
to his house, which he described as the Aapex of
horrificness,@ recounted events that occurred
in February 2005, well before April 15. 
In fact, after Houchin=s
dramatic, late-night visit to Tinch=s house,
Houchin and Appellant reconciled, and Appellant moved back into Houchin=s
house.  Houchin=s body
was found July 22, 2005, more than three months after they broke up and
Appellant moved out.

Other
than disagreements in the office, the record does not reflect any personal
interaction between Appellant and Houchin after April 15.  In the office, Houchin and Appellant argued
over whether to hire a full-time or a part-time secretary, whether to fire an
employee who had not locked the medication cabinet, and whether Appellant was
doing his share of work in the office.

After
their final breakup in April 2005, Houchin announced that she had posted her
profile on an online dating service again and had gotten over 400 hits.  Tinch testified that Appellant was not angry
about Houchin=s online dating and that he was
actually indifferent about it.  Indeed,
Appellant had developed a relationship with another woman.  Tinch also testified that Appellant was
socially inept.

The last
two people known to have seen Houchin alive were Robert Mims, a coworker, and
Amy Tinch, Bruce Tinch=s wife.  Houchin and Appellant had argued at work on
the evening of July 21, 2005, a Thursday, and Mims and Amy had gone with
Houchin to her car after Appellant left. 
Mims described the argument as one like a divorced couple would have,
with each party pushing the other=s buttons
and saying that the other needed counseling. 
Mims said that the argument seemed more hostile than he had been expecting,
but was just verbal sparring, and neither Appellant nor Houchin had made any
threats.  Mims testified that he had told
Houchin that, over the years, Asome
chaos in the office setting . . . seem[ed] to follow [her].@  Mims testified that he left Houchin around
10:50 p.m.

The
record reflects speculation that Appellant could have murdered Houchin, but
what is the evidence, circumstantial or otherwise, that he actually murdered
Houchin?  I know that we are not supposed
to consider what evidence is missing in determining that the evidence is
insufficient,[20] but surely there must be some evidence
beyond suspicion and speculation to convict someone of murder.

The State
argued that a receipt showing that a rope and a tarp were purchased at an
Academy store in Arlington on July 2, 2005 was found at the scene of the fire
in Muenster.  The State argued that this
receipt was significant because Appellant lived less than ten miles from that
store.  But there is no evidence that
Appellant is the person who made the purchase. 
There is no evidence that Houchin did not make the purchase.  She also lived in Arlington, and their office
was in Arlington.  The total land area of
Arlington is 99.5 square miles.[21]  Where in Arlington could any of its
approximately 370,450 inhabitants live without being within ten miles of the
Academy store?[22]  Is it
the State=s theory that on July 2,
Appellant planned to kill Houchin in her home on July 21 or 22 and was so well
organized that he purchased the tarp and rope in preparation, yet he was so
disorganized that he left the receipt at the scene of the fire?  He prepared so well that on July 21 or 22 he
took the tarp and the rope to her home, as well as the receipt that he managed
to leave at the scene in Muenster, yet left the bag that he carried them in at
home for the police to find?

The
majority assumes that Houchin was wrapped in a blue tarp that was tied together
with rope before she was put into the trunk of Appellant=s
car.  But there is no evidence of
that.  The theory was created by the
prosecution to explain blue marks that appear on the bumper of Appellant=s car,
but not on the edge of the trunk, the gasket, or anywhere inside the
trunk.  The theory was also created to
explain how there could be blood smears on the floor inside Houchin=s house
and on her garage floor where police investigators concluded the body had been
dragged, but no such blood smears or hairs from Houchin=s body
anywhere inside or outside of Appellant=s
car.  Although Pat Eddings, senior trace
analyst with the Tarrant County Medical Examiner=s Office,
testified that the blue fibers appeared to have been put on the bumper by
force, no one could testify how much force would have been required.  She admitted that hundreds of thousands of
items would leave the same blue marks as the tarp.  For example, she could not exclude plastic brushes
on a car wash.

So what
was the evidence that Appellant intentionally or knowingly caused the death of
Houchin by shooting her with a firearm?

$       
They had been engaged and lived together.  When she was angry, Houchin told people to
tell the police to look at Appellant if anything happened to her.

 

 








$       
Appellant and Houchin had argued at the office on the last night that
she was seen.  The argument was over
whether to write up an employee who had failed to lock the medication cabinet.

 

$       
Appellant had some empty Academy bags in his house.  He had some natural fiber rope, but it was
not the same kind of rope as that contained in the bag found in Muenster at the
fire site.

 

$       
Appellant made a call from his cell phone in Arlington, where he lived
and worked, on the night that police suspect Houchin was killed.

 

$       
Appellant did not turn in his day sheets for billing on Thursday, as
was his custom, but waited until Sunday.

 

$       
Appellant called the receptionist on Friday morning to say that he would
arrive at work late, although he testified that he made no such call, his cell
phone records reflected no such call, and he arrived on time.

 

$       
Hillman testified that there were two trunk linersCa permanent liner and a
removable plastic liner that lies on top of the permanent-cloth liner.  A spot of Houchin=s blood was found on the
permanent liner in Appellant=s car=s trunk, although there was no way to tell how
long it had been there and, presumably, it was underneath the plastic
liner.  Blue marks appeared on the bumper
of Appellant=s car.

 

$       
The police testified that there was no forced entry into Houchin=s house.

 

$       
The police testified that an opened bag of dog food in the kitchen
proved that the killer was concerned about the welfare of Houchin=s dogs, so it must have
been Appellant who killed Houchin because he must have known the dogs.

 

$       
Appellant did not seem sorry enough that Houchin was dead.

 

$       
Tinch claimed that Appellant called Houchin=s sister on the weekend to
speak of Houchin=s death before the body
was identified, although Houchin=s sister and telephone records showed that he
called only after Houchin=s body had been
identified.

 

 








$       
Appellant got an expedited passport after Houchin was killed but before
her body was identified, bought a round-trip ticket to Germany, withdrew
$20,000 from his bank account, paid his electric bill, paid his health club
bill, and left money in his bank account. 
After Houchin=s body was identified, he
contacted the police to tell them that he was going to Germany.

 

The State
argued that a circumstance supporting Appellant=s
conviction was the fact that he had planned to go to Germany but did not go and
instead attended Houchin=s funeral.  I note that Mims, one of the last two people
to see Houchin alive, did leave the country, however, and did not attend
Houchin=s
funeral.

The
medical examiner determined that Houchin had been shot three times. A
projectile with Houchin=s blood on it was found in her
house.  It was not fired from her
gun.  No evidence connects Appellant to
any firearm.  Nothing in the record
indicates that Appellant owned a firearm, had ever owned or possessed a
firearm, or had access to a firearm. 
Nothing places Appellant in or near Houchin=s house
after she left the office Thursday night.

Is this
sufficient evidence to justify a rational jury=s
concluding that the State had proved each and every element of the offense of
murder beyond a reasonable doubt under the Jackson standard?[23]  That is, looking at the evidence in the light
most favorable to the prosecution, is the evidence sufficient to prove to a
rational jury beyond a reasonable doubt that Appellant intentionally or
knowingly caused the death of Houchin by shooting her with a firearm?  The majority believes it is.  I cannot agree.

A
rational jury must consider the evidence as a whole, and not just the evidence
that may possibly imply guilt.  That is,
a rational jury considers all the evidence, and even though a reviewing court
must view the evidence in the light most favorable to the prosecution, we must
nevertheless view all the evidence, not just that evidence favorable to the
prosecution.[24]

For
example, Tinch testified that Appellant called Houchin=s sister
to tell her of Houchin=s death sometime during the
weekend after the murder but before her body was identified.  That could be considered evidence supporting
the conviction. But Houchin=s sister
testified that Appellant called her after the body was identified, and the
telephone records support her testimony. 
Under Brooks, the jury could not rationally ignore the telephone
records in favor of Tinch=s testimony.[25]

What
about evidence that is mere speculation or supposition?  The police assumed, speculated, or supposed
that the killer, rather than Houchin or the dogs themselves, ripped open a bag
of dog food and that this meant that whoever killed Houchin cared about the
dogs, and therefore must have known them, and therefore must have lived in the
house with them, and therefore must have been Appellant. Do we assume that
a rational jury gave weight to this evidence, which is unsupported by anything
other than speculation?

On the
last night that she was seen by coworkers, Houchin had plans to meet for the
first time with someone she had met through an online dating service.  He said that she had canceled the meeting
because there was something she thought she had taken care of that she had to
do that night.  The record does not
reflect that the police found an e-mail or a record of a telephone call supporting
his claim that she had canceled their meeting. 
Nothing in the record suggests that Houchin planned to meet with
Appellant that night.  Houchin did not
leave the office until 10:50 p.m.  Was
the matter that she had previously thought resolved the reason that she stayed
at work so late?  If Houchin did indeed
cancel her meeting with the man she met online, nothing in the record suggests
that the unresolved issue involved Appellant. 
Indeed, a beer can and a cigarette butt were found beside the driveway.  The police never tested them for fingerprints
or DNA.  Nor was there any evidence in
the record that Appellant smoked.

The
record also reflects that when Texas Ranger Tracy Murphree applied for search
warrants and the arrest warrant for Appellant, Murphree stated that Appellant
had made a cell call on the night that Houchin disappeared and that the call
was made from a location Ain close proximity to her house.@  At trial, however, Murphree admitted that he
could only tell that the call had been made somewhere in Arlington, but not
which cell tower handled the call or how close to Houchin=s house
the cell phone was when the call was made. 
Of course, Appellant lived and worked in Arlington, and records would
reflect that any calls he made from his home or office were made from
Arlington.  The record also reflects that
Appellant called Amy Jaggers, his girlfriend at the time, on the night that
Houchin was killed.

The police
further concluded that the killer had to be someone Houchin knew because there
was no forced entry.  What is the
evidence that the doors or windows were locked before the shooting?  There is no evidence that Appellant had a key
because Houchin had changed her locks after he moved out.  A broken window had been boarded over, but
the police entered the home through it. 
What is the evidence that no one else previously entered the home
through the same broken window?  Police
discovered blood on or near Houchin=s
computer, indicating that she was at or near her computer at some point during
the murder.  Was she working on her
computer when she was talking to her murderer, or was she surprised while she
was working on her computer?








The
majority and the prosecution rely on the fact that the body appeared to have
been dragged to the entrance of the garage, where the blood smears stop,
suggesting that Appellant=s car was waiting in the
garage.  But photographs show Houchin=s car
parked in the center of the garage, leaving no room for any other car.  Her car keys were in plain view in the
house.  There is no evidence that the police
ever examined her car to determine whether it had been used to transport her
body. Was Houchin=s car used to transport her body,
or did the murderer carry her body outside the garage to a waiting car?  It seems suspect that the blood trail ends in
Houchin=s garage,
but there is no evidence that Houchin=s car was
ever moved so that another vehicle, ostensibly Appellant=s, could
have been used to transport Houchin=s body,
and no evidence that Houchin=s car was
so used.

If the
weight of Houchin=s body was sufficient to cause
the blue tarp to smear onto the bumper, why are there no blue smears on the
plastic lining inside Appellant=s
car?  What is the evidence that Appellant
and no one else purchased a blue tarp? 
What is the evidence that the murderer bought the tarp rather than
merely using whatever was available to dispose of the body?

Indeed,
if the killer had driven Appellant=s car and
if there was no indication that he ever cleaned the interior of his car, there
would be some evidence.  The State
theorized that the killer dragged the bleeding body through the house, based on
the blood evidence in the house, yet there was no blood anywhere in the passenger
compartment of Appellant=s car.  The police found a footprint in dog feces in
the house, a footprint which the record does not show any attempt by the police
to match.  Yet no one testified that the
police found any evidence of feces in Appellant=s
car.  And even though the State=s theory
was that Houchin was killed in her home, there was also no evidence that the
killer left personal items behind or attempted to clean himself at Houchin=s
house.  Finally, even though the State
depended largely on the presence of a blue material found in scratches on the
bumper of Appellant=s car, there was no blue material
inside his trunk, nor was any evidence of a blue tarp-like material found in
Houchin=s house
or garage.  The person who moved the body
either dragged it across the garage floor or carried it to whatever car was
used to transport it.  Where are the blue
smears from dragging the tarp-wrapped body across the garage floor?  Why is there no blood transfer anywhere
inside the passenger compartment of Appellant=s car?

Additionally,
regardless of what time Appellant arrived at work on Friday, there is no
evidence that he looked disheveled, smelled of accelerant, or had blood on
him.  No evidence of bloody clothing or
instrumentalities of the crimeCother
than potentially the Academy bagCwas found
in his car or at his apartment. Furthermore, despite testimony that
Appellant called Houchin=s sister over the weekend, phone
records objectively demonstrate that he did not call Houchin=s sister
until TuesdayCafter everyone at the clinic had
learned of Houchin=s murder.

The
majority states that the passenger compartment of Appellant=s car was
messy but that the trunk was Apristine,@
containing blood and dog hairs and brown human hairs.  Although the blood was underneath the plastic
liner, it is unclear where the hairs were located in this Apristine@
environment.  The State proved that
Appellant=s car could plausibly have been
used to transport Houchin=s body somewhere.  The State also proved that Houchin could have
bled onto the trunk liner underneath the plastic liner at any time in the
previous months.








But
Appellant was neither charged with nor convicted of tampering with
evidence.  He was not convicted as a
party to the offense of murder.  He was
charged and convicted of intentionally or knowingly committing murder by
intentionally or knowingly firing a firearm. 
There is no evidence to suggest who fired the shots that killed Houchin,
that the person who killed her was the person who transported the body, that Appellant=s car was
in Muenster on the day that the body was burned, that Appellant=s car had
transported any accelerant or that Appellant had handled any accelerant, that
Appellant ever possessed or fired a firearm, or that Appellant had any
connection to the burning of Houchin=s body.

Murphree
testified that the killer knew and was concerned about the dogs and must have
torn open the dog food bag.  This
conclusion is no more than speculation. In Winfrey v. State,[26]
the evidence of guilt was not that Winfrey and the dog had a prior relationship
but that dogs alerted to Winfrey=s scent
allegedly present on the clothing worn by the murder victim at his death.  The Texas Court of Criminal Appeals held that
although dog-scent identification evidence may raise a strong suspicion of a
suspect=s guilt,
standing alone it is insufficient to establish a person=s guilt
beyond a reasonable doubt.[27]  The Texas Court of Criminal Appeals thereby
cast grave doubt on the reliability of such testimony.[28]

The Jackson
court made clear that we are not to use a Ano
evidence@ standard
in determining the sufficiency of the evidence to support a conviction.[29]  The Jackson court also made clear that
the Ano
evidence@ standard
is inadequate to protect against misapplication of the constitutional standard
of reasonable doubt:  A[A] mere
modicum of evidence may satisfy a >no
evidence= standard@ because
any evidence that is relevant and has any tendency to make the existence of an
element of a crime slightly more probable than it would be without the evidence
could be deemed a mere modicum, but Ait could
not seriously be argued that such a >modicum= of
evidence could by itself rationally support a conviction beyond a reasonable
doubt.@[30]

Respectfully,
reviewing the entire body of evidence, I would hold that the State has not
proved beyond a reasonable doubt each and every element of the murder of
Houchin but merely a plausible explanation of the crime.  When this evidence is viewed in the light
most favorable to the prosecution, no rational trier of fact could have found,
from the evidence as opposed to mere conjecture and speculation, the essential
elements of the crime beyond a reasonable doubt under the test mandated by Jackson.  I therefore respectfully dissent from the
majority=s holding
that the evidence is sufficient to support Appellant=s
conviction under the Jackson standard.

 

 

LEE ANN DAUPHINOT

JUSTICE

 

PUBLISH

DELIVERED:  October 21, 2010











[1]The record does not
indicate why, but neither the State nor Winningham called Amy Tinch to testify
at trial.





[1]443 U.S. 307, 99 S.
Ct. 2781 (1979).





[2]Butler v. State, 769 S.W.2d 234, 239
(Tex. Crim. App. 1989) (citations and quotations omitted), overruled on
other grounds by Geesa v. State, 820 S.W.2d 154, 161 (Tex. Crim.
App. 1991), overruled on other grounds by Paulson v. State, 28 S.W.3d
570, 571 (Tex. Crim. App. 2000).





[3]Brock v. State, 162 Tex. Crim. 339,
285 S.W.2d 745, 747 (Tex. Crim. App. 1956), overruled by Geesa, 820
S.W.2d at 161.





[4]646 S.W.2d 191, 197
(Tex. Crim. App. 1983).





[5]Id. at 199.





[6]Carlsen v. State, 654 S.W.2d 444, 449
(Tex. Crim. App. 1983) (op. on reh=g) (citations omitted), overruled by Geesa,
820 S.W.2d at 161, overruled on other grounds by Paulson, 28 S.W.3d at
571.





[7]Id. at 450 (McCormick,
J., concurring).





[8]Freeman v. State, 654 S.W.2d 450, 456B57 (Tex. Crim. App.
1983) (op. on reh=g) (citations and
footnote omitted), overruled by Geesa, 820 S.W.2d at 161.





[9]Id. at 456 n.*.





[10]Geesa, 820 S.W.2d at 161.





[11]Id. at 162.





[12]922 S.W.2d 126, 129
(Tex. Crim. App. 1996), overruled by Brooks v. State, No.
PD-0210-09, 2010 WL 3894613, at *1, *14 (Tex. Crim. App. Oct. 6, 2010).





[13]443 U.S. at 319, 99
S. Ct. at 2789.





[14]See Paulson, 28
S.W.3d at 573.





[15]2010 WL 3894613, at
*1.





[16]Id. at *11.





[17]See id. at *10.





[18]Id. at *8 (citing Greene
v. Massey, 437 U.S. 19, 24B25, 98 S. Ct. 2151,
2154B55 (1978); Burks
v. United States, 437 U.S. 1, 16B18, 98 S. Ct. 2141, 2150B51 (1978)).





[19]Id. at *13.





[20]See Clayton v. State, 235 S.W.3d 772, 778
(Tex. Crim. App. 2007) (AOur review of >all of the evidence= includes evidence
that was properly and improperly admitted.@) (emphasis added).





[21]City Facts and
Figures:  Get to Know Our City,
http://www.arlingtontx.gov/ cityfacts.html (last visited October 19, 2010).





[22]See id.





[23]See Jackson, 443 U.S. at 319, 99
S. Ct. at 2789.





[24]Id. at 319, 99
S. Ct. at 2789.





[25]See 2010 WL 3894613, at
*11.





[26]No. PD-987-09, 2010
WL 3656064 (Tex. Crim. App. Sept. 22, 2010).





[27]Id. at *5.





[28]See id.





[29]443 U.S. at 320, 99
S. Ct. at 2789.





[30]Id., 99 S. Ct. at 2789B90.